UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                                  Plaintiff,

       v.

CHARLES D. HOLLEY,

                                  Defendant.
_____

<u>DECISION & ORDER</u> and
<u>REPORT & RECOMMENDATION</u>

21-CR-6155DGL

## **PRELIMINARY STATEMENT**

By Order of Hon. David G. Larimer, United States District Judge, dated October 19, 2021, all pretrial matters in the above captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 23).

On October 19, 2021, the grand jury returned a single-count indictment against Charles D. Holley, charging him with possession of a firearm and ammunition as a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  (Docket # 21).  Currently pending before this Court for report and recommendation are Holley's motions to suppress statements and tangible evidence.[1]  (Docket ## 28, 40).  On January 19, 2022, this Court held an evidentiary

---

[1]  Holley filed several omnibus motions seeking other forms of relief, including an audibility hearing, *Brady* material, Rule 404(b), 608 and 609 materials, *Jencks* material, preservation of rough notes, expert notice, and leave to file additional motions.  (Docket # 28).  Each of the above-referenced motions was decided by the undersigned or resolved by the parties in open court on December 9, 2021.  (Docket ## 30, 31).

In his omnibus motions, Holley also sought to preclude identification evidence.  (Docket # 28 at ¶ 24).  During the proceedings on December 9, 2021, the government represented that it would not seek to introduce evidence of any identification procedures, and the defense agreed that the motion to preclude was therefore moot. (Docket ## 30, 31).  On this record, I recommend that the District Court deny the motion to preclude identification evidence as moot.

hearing on Holley's motions to suppress statements and evidence (Docket ## 36, 38), after which

the parties submitted post-hearing submissions (Docket ## 40, 41).  For the reasons discussed

below, I recommend that the district court deny the motions to suppress statements and tangible

evidence.

## FACTUAL BACKGROUND

This Court conducted an evidentiary hearing on January 19, 2022 concerning the

circumstances surrounding a traffic stop of a vehicle occupied by Holley and his subsequent

arrest.[2]  (Docket ## 36, 38).  The government called four witnesses: Rochester Police

Department ("RPD") Officer Jason Lathrop ("Lathrop"), New York State Department of

Corrections and Community Supervision ("DOCCS") Parole Officer Douglas Rusinko

("Rusinko"), United States Marshals Service ("USMS") Deputy Ryan Spain ("Spain"), and

USMS Task Force Officer William Baker ("Baker").  Video footage from blue light cameras and

a body camera worn by Lathrop was also introduced into evidence and reviewed by the Court.

(Government's Exhibits ("G. Exs.") 1 and 4).

---

Prior to the suppression hearing, the government filed a motion for a protective order (Docket # 32) and three *ex parte* motions seeking *Giglio* determinations (Docket ## 33, 34, 35).  These are the only pending motions that are resolved herein by Decision and Order; the remaining pending motions are addressed by Report and Recommendation.  During the suppression hearing, I indicated that I agreed with the government that it was not required to disclose the information identified in the *ex parte* motions prior to the witnesses' testimony, but reserved further decision pending review of their testimony.  (Docket # 38 at 3).  Nothing in their testimony alters my conclusion that the information need not be disclosed at this stage.  Accordingly, the government's *ex parte Giglio* motions (Docket ## 33, 34, 35) are granted.  As I indicated during the hearing, I make no findings as to whether the information will have to be disclosed during trial or other subsequent proceedings.  (Docket # 38 at 4).

With respect to the government's motion for a protective order, I granted that motion based upon the government's representation that it was not relying on the arrest warrant as justification for the traffic stop.  (Docket # 38 at 5-10).  Again, that motion was granted solely for the purposes of the suppression hearing, and I make no findings as to whether the informant's identity or the specific information disclosed by the informant will have to be produced in connection with subsequent proceedings.

[2]  The transcript of the January 19, 2022 hearing shall be referred to as "Tr. __."  (Docket # 38).

I.    **Testimony of Spain**

At the time of his testimony, Spain had been employed by the USMS for approximately four-and-a-half years and was assigned to the regional fugitive task force operating in Rochester.  (Tr. 59-60).  Spain was on duty the evening of July 2, 2021, and was a member of a surveillance team attempting to locate and apprehend Holley pursuant to a parole absconder warrant.  (Tr. 61-62, 85).  Spain was driving an unmarked police vehicle that was equipped with lights and sirens, and USMS Deputy Mike Daley was a passenger in the vehicle.  (Tr. 63, 84-85).  The surveillance team's efforts were focused on locating a Buick Lacrosse sedan, "goldish" in color.  (Tr. 63, 83-84).  Spain was notified by radio that the Buick had been located, and he began following the identified Buick as it turned right from West Main Street onto Ford Street.  (Tr. 64, 78; G. Ex. 2).

According to Spain, the vehicle's windows were heavily tinted, and surveillance officers were unable to discern the number or identity of the occupants.  (Tr. 64-65, 85-86).  Spain followed the vehicle from a distance of approximately one-and-a-half car lengths as it continued right onto Ford Street, past the split with Interstate 490.  (Tr. 65-67, 79-80, 86, 91; G. Exs. 2 and 3).

Spain continued following the vehicle as it turned right from Ford Street onto Dr. Samuel McCree Way.  (Tr. 69, 80, 88; G. Ex. 2).  Spain testified that the posted speed limit was 30 miles per hour according to a speed limit sign on Ford Street near the intersection with Dr. Samuel McCree Way.  (Tr. 70).  As Spain turned onto Dr. Samuel McCree Way, he was unable to see the Buick because it had begun to travel more rapidly and had made an immediate left turn onto Olean Street.  (Tr. 69, 80, 89; G. Ex. 2).  By the time Spain's vehicle turned onto Olean Street, the Buick was "well down the road," and Spain observed that it was traveling at "a great

speed." (Tr. 69). Spain drove his vehicle down Olean Street at a speed of "well over 50 miles per hour," and the Buick continued to gain distance on Spain's vehicle. (Tr. 71). Spain did not use a speed detector radar on the Buick and was unable to indicate precisely how fast the Buick was traveling, but, based upon his experience, he believed that the Buick was traveling more than 50 miles per hour – the speed at which Spain was traveling.[3] (Tr. 71-72, 90-91).

Spain testified that there are two stop signs on Olean Street. (Tr. 73). He observed the Buick pass both stop signs without stopping. (Tr. 73). Spain turned on his vehicle's lights and sirens. (Tr. 74, 90). Spain could not recall whether he activated his lights and sirens before or after the Buick drove past the first stop sign; other than speeding and excessive tint on the windows, Spain did not recall observing any other traffic infractions committed by the Buick before he turned on his lights. (Tr. 74, 86-87, 91). Spain testified that Olean Street ends at a T-intersection with Bartlett Street, and he observed the Buick turn left onto Bartlett Street and then right onto South Plymouth Avenue. (Tr. 74-75, 81; G. Ex. 2).

As Spain approached South Plymouth, he noticed Officer Baker's vehicle approach the Buick from behind and take over primary surveillance of the Buick. (Tr. 75). Spain continued to follow Baker's vehicle. (Tr. 75). Spain deactivated his emergency lights on South Plymouth, but he reactivated them again after observing the Buick pass through intersections with traffic signals that were turning red. (Tr. 75-76). At some point Spain lost sight of the Buick, but he overheard on the radio that the Buick had crashed in the area of the intersection of Genesee Street and Seward Street. (Tr. 76). Spain testified that there were other

---

[3] Spain also testified that throughout his pursuit of Holley Spain drove his vehicle at speeds ranging between 50 and 80 miles per hour and "never came close to gaining any distance between [his vehicle] and th[e] Buick." (Tr. 72).

officers at the scene of the crash when he arrived and that Holley was arrested at the scene. (Tr. 76).

## II.    **Testimony of Baker**

At the time of his testimony, Baker had been employed by the RPD for approximately twenty years and was assigned to the USMS as a Fugitive Task Force Officer. (Tr. 93-94).  On July 2, 2021, Baker was working with the surveillance team that was attempting to apprehend Holley pursuant to the parole absconder warrant.  (Tr. 95-96).  Baker was driving an unmarked law enforcement vehicle that was equipped with lights and sirens, and the team was conducting surveillance on a Buick Lacrosse.  (Tr. 96-97).

Baker was informed over the radio that the Buick had been observed in the area, and he first observed it on Reynolds Street, at the intersection with Dr. Samuel McCree Way. (Tr. 97, 123-24, 127).  He noticed that the tint on the windows was "extremely dark," which prevented him from identifying any of the occupants.  (Tr. 99, 130).  Baker testified that he received training concerning vehicle window tint and that the Buick's windows appeared to have darker tint than the seventy-percent tint level on the windows of marked police vehicles. (Tr. 99-100).  According to Baker, although the window tint appeared darker than permitted by law, he did not attempt a traffic stop at that point.  (Tr. 99-100, 130).  Baker followed the Buick as it continued northbound on Reynolds Street.  (Tr. 100, 127).  He continued following the Buick from "quite a distance" as it turned eastbound on Main Street and then southbound on Ford Street.  (Tr. 128-29).  At the intersection of Ford Street and Dr. Samuel McCree Way, Baker continued southbound on Ford Street, parallel to the Buick as it traveled southbound on

Olean Street.  (Tr. 100-101, 129).  According to Baker, Spain followed behind the Buick as it turned down Samuel McCree Way and then down Olean Street.  (Tr. 101).

As he was traveling parallel to the Buick, Baker observed it traveling at a high rate of speed down Olean Street.  (Tr. 101).  According to Baker, his view of the Buick was obstructed at times, but at other times, such as when he passed vacant lots, he was able to see the vehicle.  (Tr. 126).  Baker testified that he believed that Spain activated his emergency lights for the first time on Olean Street.  (Tr. 125).  As Baker approached the intersection of Bartlett Street and South Plymouth Avenue, the Buick cut in front of him at a "high rate of speed" and continued southbound on South Plymouth.  (Tr. 102).  According to Baker, he was traveling at approximately 50 miles per hour in an attempt to catch the Buick, which he estimated to be traveling "at least 60 miles an hour."  (Tr. 102).  Baker testified that the speed limit in that area was 30 miles per hour, which was marked on a sign on South Plymouth Avenue.  (Tr. 102).

Baker continued to follow the Buick down South Plymouth Avenue, and he activated his emergency lights and sirens as the vehicles approached the intersection of Brooks and Genesee Street.  (Tr. 103-104; G. Ex. 2).  Brooks testified that he observed the Buick drive through a red light without stopping at the intersection of Brooks Avenue and Thurston Road.  (Tr. 105-106).  The Buick continued traveling westbound on Brooks Avenue past the ramp for Interstate 390, at which point the Buick made a U-turn and began traveling eastbound on Brooks Avenue.  (Tr. 106; G. Ex. 2).  The Buick then continued at a high rate of speed as it approached the intersection of Brooks Avenue and Genesee Street, where it made a northbound turn onto Genesee Street.  (Tr. 107; G. Ex. 2).

As Baker followed the Buick onto Genesee Street, he observed the Buick, which was still traveling at a high rate of speed, strike a vehicle near the intersection of Genesee and

Sawyer Streets and cause a multi-vehicle accident. (Tr. 107, 131-32; G. Ex. 2). The Buick's driver, later identified as Holley, exited the Buick and began to run northbound on Genesee Street. (Tr. 108). Baker exited his vehicle with his gun drawn and began moving towards Holley in an attempt to take him into custody. (Tr. 132-33). Marked and unmarked police vehicles approached the scene driving southbound on Genesee, and Baker observed Holley turn and begin running northbound in Baker's direction. (Tr. 108, 133). Baker stopped, identified himself as a police officer, and instructed Holley to show his hands. (Tr. 133). He observed Holley remove an object from the front of his waistband and throw it towards a nearby building. (Tr. 108, 134). Baker testified that he was approximately twenty feet away when he saw Holley throw the object, which landed between the building and a bush. (Tr. 108, 134-35).

Baker ordered Holley to the ground, and Holley complied. (Tr. 135-36). Another officer, Deputy Anderson, helped Baker handcuff Holley, who was then placed in a patrol vehicle. (Tr. 122, 135-36). Immediately after restraining Holley, Baker approached the area where the object landed, and he observed a handgun on the ground between the bush and the building. (Tr. 108-109, 120-21, 137; G. Exs. 5-8[4]). Baker stayed with the handgun until it was collected by an RPD technician. (Tr. 121-22, 137).

Baker reviewed footage from three blue light cameras located at the intersections of Plymouth Avenue and Violetta Street, Genesee and Sawyer Streets, and Thurston Road and Brooks Avenue. (Tr. 109; G. Ex. 4). He testified that the footage from each intersection captured the Buick proceeding through the respective intersection, followed by the truck that

---

[4] Several of the photographs introduced by the government are apparently misnumbered. During the hearing, these photographs were referred to as Government's Exhibits 5-8 although they are marked as Exhibits 4-7. (Tr. 119-22). The DVD containing the blue light camera footage is also marked as Exhibit 4. To avoid confusion, these photographs are referred to herein as Government's Exhibits 5-8, which is how they were identified during the hearing. Any reference herein to Government's Exhibit 4 refers to the DVD containing the blue light camera footage.

Baker was driving. (Tr. 108-18). The footage taken from the camera at the intersection of Brooks Avenue and Thurston Road depicts the Buick driving through the intersection without stopping. (G. Ex. 4 at 00:00:11). One second later, as a result of repositioning by the camera, the red traffic light is visible. (G. Ex. 4 at 00:00:12; Tr. 115-16). The footage also demonstrates that the emergency lights on Baker's truck were flashing when it passed through that intersection. (G. Ex. 4 at 00:00:13 – 00:00:16; Tr. 116).

### III.    Testimony of Lathrop

Lathrop testified that he had been employed by the RPD as a police officer for approximately fourteen years. (Tr. 13-14). On July 2, 2021, at approximately 7:45 p.m., Lathrop arrived on the scene of a motor vehicle accident near the intersection of Sawyer and Genesee Streets. (Tr. 15-16, 27). At the time of his arrival, Holley was already in custody and handcuffed. (Tr. 18-19). Officer Hasper escorted Holley to Lathrop's police vehicle for transportation to the Public Safety Building. (Tr. 18, 28, 40). According to Lathrop, although Hasper had one hand placed on Holley's arm in order to guide him to the vehicle, Holley appeared able to walk to the vehicle on his own. (Tr. 41-43). Lathrop did not know whether any officers at the scene had spoken to or questioned Holley or whether he had been advised of his *Miranda* rights. (Tr. 28).

Holley was placed into the back of Lathrop's vehicle, and Lathrop testified that Holley was not free to leave. (Tr. 29). At some point, Lathrop asked Holley for his name and date of birth, which Holley provided. (Tr. 18, 30-31). After about five minutes, Lathrop started driving to the Public Safety building. (Tr. 32). Lathrop knew that Holley was alleged to have caused a motor vehicle accident and to have thrown a handgun. (Tr. 32).

8

Lathrop testified that during the drive, Holley told him, in sum and substance, that the items in the Buick belonged to him, that no one else should be arrested, and that the "shit" that was thrown was his. (Tr. 19, 33-34). According to Lathrop, Holley never used the word gun and never indicated what he meant by the word "shit." (Tr. 34-35). Lathrop testified that he did not ask Holley any questions to elicit these statements and never made any promises or threats to Holley to induce the statements. (Tr. 19-20). According to Lathrop, other than asking for pedigree information, the only communication he had with Holley was to tell him that Lathrop did not have any information about the investigation. (Tr. 33). At no time did Holley indicate that he wanted an attorney or that he did not wish to speak to Lathrop. (Tr. 20). Lathrop testified that he did not inform Holley of his *Miranda* rights. (Tr. 37).

After driving a few blocks, Holley indicated to Lathrop that he was injured. (Tr. 20). Lathrop recalled that Holley complained of neck pain. (Tr. 35). At that time, Lathrop notified his supervisor, returned to the scene, contacted dispatch to request an ambulance, and waited for an ambulance to arrive. (Tr. 20, 36). Lathrop testified that he is a trained drug recognition expert and, based upon his observations of Holley, including the lack of any slurred speech or glossy or bloodshot eyes, Lathrop did not believe that Holley was under the influence of drugs or alcohol. (Tr. 21, 37-40). Lathrop testified that Holley did not appear to have any visible injuries and appeared coherent, was not crying, and did not appear to be in pain. (Tr. 21, 38-39). At some point, Holley asked about the air conditioning in the vehicle, and Lathrop turned it as high as it would go. (Tr. 31).

Lathrop testified that after Holley was placed into his vehicle, Lathrop affixed his body worn camera to his dashboard. (Tr. 21-22). According to Lathrop, the footage from the

body camera depicts the statements Holley made to Lathrop.  Specifically, it reflects the

following statements by Holley:

> Hey yo, bro.  Anything in that car right now, tell them right now.
> So, whatever in that car, so I'm going to own to [inaudible].
> That's all my shit, so I don't wanna try to take nobody.  They ain't
> grab nobody else, right?  Yo, you can't figure out what we did
> though?  Yo, I don't want to take nobody to jail, man, for it.  You
> know what I'm saying?  I threw all that shit, whatever it is
> [inaudible].

(G. Ex. 1 at 19:51:35 – 19:52:00).  The footage also shows that Lathrop was not engaged in

conversation with Holley at the time Holley initiated those statements and did not ask him any

questions.  (G. Ex. 1 at 19:49:05 – 19:51:31).  While Holley was making these statements,

Lathrop briefly conversed with another officer through his car window and at one point

responded to Holley that he did not have any information about what was going on and that

"we'll figure it out in a minute."  (G. Ex. 1 at 19:51:43 – 19:51:49).  Holley made several other

largely inaudible statements to Lathrop while he was inside Lathrop's car; Lathrop generally

responded that he had just arrived at the scene in order to transport Holley and that he did not

have any information.  (*See generally* G. Ex. 1 at 19:51:43 – 19:55:54).


IV.    **Testimony of Rusinko**

Rusinko testified that he is employed by the Parole Division of DOCCS and has

been assigned to the USMS Fugitive Task Force for the past four years.  (Tr. 44).  On July 2,

2021, he was a member of the team tasked with locating and apprehending Holley pursuant to a

parole warrant.  (Tr. 45-46, 55).  Rusinko did not recall having any interactions with Holley prior

to July 2, 2021.  (Tr. 53).

On that date, Rusinko learned that Holley had been apprehended and arrived at the scene of the car accident on Genesee Street at approximately 7:44 p.m. (Tr. 46-47). By the time Rusinko arrived, Holley had already been placed in the back of a marked RPD vehicle. (Tr. 47, 53). While Rusinko was speaking to another member of law enforcement approximately twenty feet from the patrol car, Holley called him over to the vehicle by yelling, "Parole, Parole." (Tr. 47).

Rusinko approached the rear passenger window of the patrol car, and Holley told him that the gun, drugs, and bulletproof vest belonged to him. (Tr. 47-48). Rusinko testified that Holley expressed concern about the woman who had been in the Buick with him when it crashed and inquired about an ambulance for himself. (Tr. 54-55). Rusinko did not recall that Holley had any visible injuries. (Tr. 56). According to Rusinko, prior to Holley's statements, he did not ask Holley any questions or make him any promises to him. (Tr. 50-52). Rusinko testified that Holley never informed him that he did not wish to speak to him or other officers and did not request an attorney. (Tr. 52).

Rusinko reviewed a portion of the footage from Lathrop's body camera and confirmed that it accurately captured Rusinko's exchange with Holley. (Tr. 49-50). The footage depicts Holley making the following statements:

> Yo parole. Yo parole. Yo parole. Hey yo. Hey yo, I understand you parole. I done seen you at parole. Man, everything in that car, bro, I had a lot of shit in that car. I had drugs on me and I had a gun. I threw that shit and I had a vest. I don't want her to own none of that shit, man. That's her car bro. That's her car, but I don't want her to have to be punished for that shit. I had a vest in there. I had a gun in my pocket I threw and then I have some fuckin drugs. You know what I'm sayin? Can you please, man, just let her go, man. Let her go. And I done fucked her car up, man. Don't make it worse for her. Please man, please, thank you man. Please, help me out man.

(G. Ex. 1 at 20:06:12 – 20:06:57). After reviewing the footage, Rusinko testified that during this exchange he may have advised Holley that they were waiting for the ambulance to arrive. (Tr. 51).

## V.    Holley's Affidavits

Holley submitted two affidavits concerning the circumstances of the July 2, 2021 traffic stop. (Docket ## 28-1; 28-2). Holley affirms that he made statements to officers when he was arrested on July 2, 2021. (Docket # 28-1 at ¶ 7). According to Holley, on that date, he was driving a brown 2012 Buick Lacrosse that was illegally stopped by law enforcement. (*Id.* at ¶ 8). Holley maintains that his statements were the result of the illegal stop and illegal questioning by the officers. (*Id.*). Holley further asserts that he was not advised of his *Miranda* rights prior to making the statements. (*Id.* at ¶ 9).

Holley contends that he had an expectation of privacy in the Buick because he had access to the vehicle and kept personal items in it with the expectation that he would have exclusive access to those personal items. (Docket # 28-2 at ¶¶ 7-8). According to Holley, he did not consent to the search of the Buick and the officers searched it and seized evidence that was in it without lawful justification. (*Id.* at ¶ 9).

## REPORT & RECOMMENDATION

Holley seeks to suppress all evidence seized from the Buick and any statements he made during the traffic stop July 2, 2021. (Docket ## 28, 40).

I.    **Lawfulness of the Traffic Stop**

        Holley seeks to suppress his statements and any evidence seized from the Buick on the grounds that the officers lacked a lawful basis to conduct the traffic stop.  According to Holley, the evidence fails to establish that he had committed any traffic infraction at the time Spain activated his emergency lights and sirens, and the officers did not otherwise have reasonable suspicion to stop the vehicle.[5]  (Docket # 40 at 2-7).  The government counters that Holley was not seized within the meaning of the Fourth Amendment until he was physically restrained.  (Docket # 41 at 9).  By that point, according to the government, the officers had observed the Buick commit multiple traffic violations that justified Holley's arrest.  (*Id.* at 9-10).

        An ordinary traffic stop constitutes a limited seizure within the meaning of the Fourth Amendment, *United States v. Wallace*, 937 F.3d 130, 137 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 2551 (2020), and must be justified by "probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity," *id.* (quoting *United States v. Gomez*, 877 F.3d 76, 86 (2d Cir. 2017)); *see Terry v. Ohio*, 392 U.S. 1, 30 (1968) (police officer may lawfully conduct brief stop if officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot"); *see also Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (routine traffic stop is more analogous to *Terry* stop than to formal arrest).  Evidence obtained as the result of an unjustified traffic stop "is subject to the fruit of the poisonous tree doctrine and may be suppressed."  *United States v. Harrell*, 268 F.3d 141, 148 (2d Cir. 2001)

---

[5]  Holley maintains that the evidence fails to establish that the officers had reasonable suspicion to believe that he was inside the vehicle and that the officers thus lacked any basis to stop the vehicle in order to arrest him. (Docket # 40 at 2-7).  The government represented during the suppression hearing that it does not contend that the officers had reasonable suspicion to believe that Holley was inside the vehicle and does not seek to justify the vehicle stop on that basis.  (Tr. 6).

(quoting *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.), *cert. denied*, 513 U.S. 877 (1994));
*see also Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

On a motion to suppress, the defendant bears the initial burden of establishing that
a government official acting without a warrant subjected him to a search or seizure.  *See United
States v. Peeples*, 962 F.3d 677, 692-93 & n.59 (2d Cir.) (citing *Rakas v. Illinois*, 439 U.S. 128,
130 n.1 (1978) ("[t]he proponent of a motion to suppress has the burden of establishing that his
own Fourth Amendment rights were violated by the challenged search or seizure")), *cert. denied*,
141 S. Ct. 1279, *reh'g denied*, 142 S. Ct. 48 (2021).  Where the defendant does so, the burden
then shifts to the government to demonstrate by a preponderance of the evidence that the search
or seizure did not violate the Fourth Amendment.  *United States v. Strachon*, 354 F. Supp. 3d
476, 483 (S.D.N.Y. 2018) ("[o]nce the movant establishes some basis for the suppression
motion, the burden of proof shifts to the [g]overnment, which then carries the burden to
demonstrate by a preponderance of the evidence that the search or seizure did not violate the
Fourth Amendment").

Holley challenges Spain's attempted stop of the Buick by activating his lights and
sirens on Olean Street on the grounds that Spain lacked reasonable suspicion to conduct a stop at
that time.  The law is well-settled, however, that "a police pursuit in attempting to seize a person
does not amount to a 'seizure' within the meaning of the Fourth Amendment."  *United States v.
Swindle*, 407 F.3d 562, 572 (2d Cir.) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 844
(1998)), *cert. denied*, 546 U.S. 913 (2005).  "Put simply, attempted seizures of a person are
beyond the scope of the Fourth Amendment."  *Id.* (internal quotation and bracket omitted).
Rather, "an order to stop must be obeyed or enforced physically to constitute a seizure."  *Id.*; *see
also Brendlin v. California*, 551 U.S. 249, 255 (2007) ("[a] police officer may make a seizure by

a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned").

   The credible evidence demonstrates that Holley did not stop the Buick or otherwise submit to Spain's show of authority. Rather, the record clearly establishes that Holley fled from Spain's vehicle, led officers on a high speed chase during which he committed multiple traffic violations, caused a multi-vehicle accident, fled on foot from the Buick after it crashed, and was apprehended by law enforcement only after fleeing and discarding an object later discovered to be a handgun. For Fourth Amendment purposes, Holley was seized when he was physically restrained by Baker and Anderson. *See United States v. Swindle*, 407 F.3d at 572-73 ("[r]egardless of how unreasonable it was for the officers to *order* [defendant] to pull over, and regardless of how reasonable it was for [defendant] to have felt restrained in the face of the flashing police strobe light, there was no immediate 'physical force' applied or 'submission to the assertion of authority'; . . . [t]herefore, no seizure immediately occurred") (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)); *United States v. Krubally*, 2021 WL 2000394, *4 (S.D.N.Y. 2021) ("[a] person is seized either when physical force is applied to the person or a person submits to law enforcement's assertion of authority"); *United States v. Sockwell*, 2021 WL 5179978, *2 (D. Conn. 2021) ("[f]leeing suspects are not seized until they are physically restrained or otherwise submit to a police officer's show of authority"); *United States v. Brown*, 2014 WL 12837765, *10 (W.D.N.Y. 2014) ("[t]he fact that officers were pursuing him with lights flashing and sirens blaring . . . did not cause [defendant] to be seized"), *report and recommendation adopted by*, 2016 WL 4607408 (W.D.N.Y. 2016). By that time, the arrest of Holley was supported by ample probable cause, consisting of the multiple traffic

infractions he committed during the chase and his flight by vehicle and foot after officers attempted to stop him.[6]  *See United States v. Baldwin*, 496 F.3d 215, 219-20 (2d Cir. 2007) (holding defendant's ultimate seizure could be "justified by events that unfolded after an order to stop"; "[defendant's] pre-seizure behavior – including fleeing from police, the operation of his vehicle, crashing his vehicle and running away on foot" provided probable cause justifying his arrest), *cert. denied*, 552 U.S. 1222 (2008); *United States v. Sockwell*, 2021 WL 5179978 at *3 ("the analysis of the stop must take account of all the information the police learned before they apprehended [the defendant], including . . . [defendant's] flight and tossing items onto a front yard"); *United States v. Brown*, 2016 WL 4607408, *3 (W.D.N.Y. 2016) ("[defendant's] flight following [detective's] order to stop (whether or not that order was reasonable), and [defendant's] subsequent violation of several traffic laws, provided probable cause for [defendant's] eventual arrest").

With respect to the basis for finding probable cause to believe that Holley had committed traffic violations, the record demonstrates that both Spain and Baker personally observed the Buick commit several traffic violations before Holley exited it, attempted to flee, and was apprehended.  Spain testified that he observed the Buick fail to stop at two stop signs as it traveled down Olean Street – a violation of New York Vehicle and Traffic Law ("NYVTL") Section 1172(a).  *See United States v. Sebbern*, 2012 WL 5989804, *4 (E.D.N.Y. 2012) ("[the officer] testified that he personally observed the automobile run a stop sign – a violation of

---

[6]  The government maintains Holley's arrest was also justified by the parole warrant because officers were able to identify him as the subject of the warrant after he exited the Buick.  (Docket # 41 at 9-10).  The hearing testimony does not establish, however, that either Baker or Anderson recognized Holley as the subject of the arrest warrant at the time they apprehended him.  The government further maintains that Holley's arrest was justified by Baker's observation of him throwing an object that was later identified to be a revolver.  (*Id.* at 10).  At the time Holley was physically restrained, Baker observed that Holley had thrown an object but did not know that the object was a firearm.  (Tr. 108-09, 134-35).  Although his observations provided reasonable suspicion to detain Holley while he investigated what the object was, probable cause to arrest him for possession of a firearm did not arise until after Baker had determined that the object was a handgun.

Section 1172(a) of New York State's Vehicle and Traffic Law[;] . . . [the officer's observations . . . gave him probable cause to arrest the driver"). Baker testified unequivocally that he observed the Buick fail to stop at a red traffic light while traveling through the intersection of Brooks Avenue and Thurston Road – a violation of NYVTL Section 1111(d)(1). *See United States v. Miller*, 382 F. Supp. 2d 350, 356 (N.D.N.Y. 2005) ("[r]unning a red light is a traffic offense in violation of . . . New York State Vehicle and Traffic Law § 1111(d)(1) and (2)(a)"); *Johnson v. City of New York*, 2020 WL 2732068, *4 (S.D.N.Y. 2020) ("[officers] had probable cause to arrest [individual] for running a right light, in violation of N.Y. Veh. & Traf. Law § 1111(d)(1)"), *appeal filed*, No. 21-535 (2021). Both Spain and Baker testified that the Buick did not pull over in response to the activation of their emergency lights and sirens, another violation of the traffic law. *See United States v. Bogle*, 2008 WL 222673, *3 (E.D.N.Y. 2008) ("[w]hen [the officer] turned on his siren and lights, indicating that [the defendant] should pull over, [the defendant] attempted to flee in violation of N.Y. Veh. & Traf. Law § 1102"). Moreover, Baker testified that Holley attempted to flee the scene of a motor vehicle accident without reporting it – a violation of NYVTL Section 600. *See* N.Y. Veh. & Traf. Law § 600(1).

In addition, although neither Spain nor Baker used a radar device to determine the Buick's precise speed, they both testified that they were able to estimate the Buick's speed by comparison to the speed at which they were traveling. According to Spain, the Buick continued to gain distance from his vehicle while Spain was traveling more than fifty miles per hour. Similarly, Baker testified that he was traveling at approximately fifty miles per hour in an attempt to catch up to the Buick. Based upon these observations, both Spain and Baker estimated that the Buick was traveling at a speed in excess of 50 miles per hour, far greater than the posted speed limit of 30 miles per hour. Crediting Spain's and Baker's testimony, I find

these observations sufficient to establish probable cause that a traffic violation occurred. *See United States v. Williams*, 2016 WL 11447844, *7 (E.D.N.Y.) ("[the detective] confirmed his belief that the defendant was speeding because he testified that he had to 'speed up past the speed limit in order to stay in pace with the vehicle;' . . . [t]his effort by [the detective] to 'pace' the vehicle clearly provided the officers with sufficient probable cause to stop [and arrest] the defendant"), *report and recommendation adopted by*, 2016 WL 4542352 (E.D.N.Y. 2016), *aff'd*, 930 F.3d 44 (2d Cir. 2019), *cert. denied*, 141 S. Ct. 2816 (2021); *see also United States v. Hicks*, 2018 WL 6595934, *5 (W.D.N.Y. 2018) (officer's testimony that "[by] using his speedometer to 'pace' the vehicle, he determined that it was driving ten miles per hour in excess of the speed limit" was sufficient to justify a stop of the vehicle); *United States v. Fable*, 2018 WL 3727346, *4 (D. Conn. 2018) ("while a radar gun may provide proof that a driver exceeded the speed limit, it is not necessary to form probable cause to stop a vehicle for speeding[;] . . . [h]ere, [the officer] testified that the vehicle was driving 'in excess of 60 miles per hour,' which was twice the speed limit and could be observed with the naked eye").[7]

---

[7]  Indeed, the speeding violation was observed prior to Spain's activation of his emergency lights and, contrary to defendant's contention, would have justified his stop of the vehicle, had Holley submitted to Spain's show of authority. *See United States v. McCall*, 2007 WL 1845584, *8 (W.D.N.Y. 2007) ("[t]he observation of the traffic infraction alone creates an objective circumstance to justify the traffic stop"). Similarly, both Spain and Baker observed excessive tint on the Buick's windows prior to Spain's initial attempt to stop the Buick.  "New York law prohibits the operation of a vehicle on a 'public highway, road or street' with side windows that 'are composed of, covered by or treated with any material which has a light transmittance of less than seventy percent.'" *See United States v. Lucas*, 338 F. Supp. 3d 139, 154 (W.D.N.Y. 2018) (quoting N.Y. Veh. & Traf. Law § 375(12-a)(b)(2)), *motion to reopen denied*, 379 F. Supp. 3d 182 (W.D.N.Y.), *reconsideration denied*, 383 F. Supp. 3d 105 (W.D.N.Y. 2019), *aff'd*, 2021 WL 3700944 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1395 (2022).  Although the record does not contain evidence that the tint of the windows was tested, the officers' observations of excessive tint was adequate to justify the stop of the vehicle.  *See United States v. Harrell*, 268 F.3d 141, 149 (2d Cir. 2001) (although the officer testified he did not "observe" a tinted-window violation, probable cause nevertheless existed because an "objectively reasonable" officer would have suspected them to be tinted in violation of the traffic law); *United States v. Lucas*, 338 F. Supp. 3d at 154 ("[s]topping a vehicle based upon probable cause or reasonable suspicion that a vehicle is being operated with tinted windows in violation of § 375(12-a)(b2), even if the officers' true motivations are driven by a desire to investigate other illegal activity, complies with the Fourth Amendment[;] . . . [i]n other words, law enforcement agents' true objective are not relevant to the analysis"); *United States v. Garcia*, 279 F. Supp. 2d 294, 299 (S.D.N.Y. 2003) ("[t]he fact that [the officer] never tested the windows with a 'tint meter' to determine if they were, in fact, in violation of the law is immaterial, as only an objectively reasonable belief or suspicion of a violation, supported by articulable facts, is required").

In sum, considering the totality of the circumstances at the time of Holley's seizure, including the observed traffic violations, Holley's high-speed flight from the officers which ended in a multi-vehicle-accident, and Holley's attempt to flee the scene on foot, I conclude that ample probable cause supported his arrest. *See United States v. Kiture*, 776 F. App'x 747, 749 (2d Cir. 2019) (summary order) ("[b]y the time [defendant] was later arrested, and therefore indisputably seized, he had engaged the officers in a high-speed chase, run a red light, and driven into parked vehicles, giving the police ample probable cause for his arrest"); *United States v. Bogle*, 522 F. App'x 15, 20 (2d Cir. 2013) (summary order) ("the officers had probable cause to stop [defendant's vehicle] and arrest him for violating the New York Vehicle and Traffic Law" where the officer testified that "he observed [defendant] drive at an unsafe speed on the wrong side of the street, drive through a red light, and attempt to avoid arrest once [the officer] turned on his lights and siren"); *United States v. Brown*, 2014 WL 12837765 at *10 (officers had probable cause to arrest defendant for traffic violations they observed during pursuit; "[defendant's] driving of the [vehicle][] certainly gave the officers probable cause to stop the vehicle for violation of the New York Vehicle and Traffic Law . . ., *i.e.*, speeding and failing to stop when being pursued by flashing red lights and sirens blaring"); *see also United States v. Sebbern*, 2012 WL 5989804 at *4 (observation of traffic violations provides probable cause to arrest the driver of the vehicle).  Accordingly, I recommend that the district court reject Holley's challenge to the lawfulness of the stop.

II.    **Tangible Evidence**

      Holley also seeks to suppress evidence found inside the Buick after his arrest.[8] (Docket ## 28 at ¶ 42; 40 at 2-7).  The government opposes the motion on the grounds that Holley has failed to establish standing to challenge the search of the Buick.  (Docket # 29 at 11-12).  During oral argument on December 9, 2021, I informed Holley and his counsel that the affidavit submitted by Holley was inadequate to demonstrate that Holley had a protectible interest in the Buick and offered Holley an opportunity to supplement his affidavit by December 16, 2021.  (Docket ## 30, 31).  Holley has filed no supplemental affidavit.  By letter dated January 6, 2022, the government confirmed that it had not received a supplemental affidavit and thus did not intend to present any evidence during the hearing regarding the search of the Buick. (Docket # 42).  At the hearing, the Court confirmed that it had received the government's letter and agreed with the government's expressed understanding of the scope of the hearing.  (Tr. 11).

      The law is well-established that a defendant seeking to suppress evidence must demonstrate by a preponderance of the evidence that he had a reasonable expectation of privacy in the location or items searched.  *Rakas v. Illinois*, 439 U.S. 128, 143 (1978); *United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993); *United States v. Osorio*, 949 F.2d 38, 40 (2d Cir. 1991).  This expectation of privacy must be both subjectively and objectively reasonable – that is, the defendant must have a subjective expectation of privacy and that expectation must be one that is deemed objectively reasonable by society at large.  *United States v. Fields*, 113 F.3d 313, 320 (2d Cir.), *cert. denied*, 522 U.S. 976 (1997); *United States v. Osorio*, 949 F.2d at 40.  Courts generally evaluate standing by considering "whether the defendant had any property or

---

[8]  During proceedings before the Court on December 9, 2021, defense counsel confirmed that Holley does not seek suppression of the handgun found on the ground after he was apprehended.

possessory interest in the place searched or the items seized." *United States v. Osorio*, 949 F.2d at 400.

The burden of establishing standing falls squarely upon the defendant. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980). This burden "is met only by sworn evidence, in the form of an affidavit or testimony, from the defendant or someone with personal knowledge. The defendant's unsworn assertion of the Government's representations does not meet this burden." *United States v. Montoya-Escheverria*, 892 F. Supp. 104, 106 (S.D.N.Y. 1995) (citations omitted); *see also United States v. Molina-Rios*, 2016 WL 8669634, *1 (W.D.N.Y. 2016), *report and recommendation adopted by*, 2017 WL 279554 (W.D.N.Y. 2017).

Holley has failed to submit to this Court any sworn assertions, whether by him or someone with personal knowledge, to demonstrate that he had a reasonable expectation of privacy in the Buick. His affidavit does not contain sufficient facts to establish that he had a protectible privacy interest in the Buick. For example, it does not identify the owner of the vehicle or any facts upon which he bases his assertion that he maintained or had "private access to" personal property in the vehicle. Nor does it address how Holley obtained permission to use the car, from whom he obtained permission, or how often he used the car. *See*, *e.g.*, *United States v. Pena*, 961 F.2d 333, 337 (2d Cir. 1992) ("[w]here the defendant offers sufficient evidence indicating that he has permission of the owner to use the vehicle, the defendant plainly has a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle") (quoting *United States v. Rubio-Rivera*, 917 F.2d 1271, 1275 (10th Cir. 1990)); *United States v. Bailey*, 2016 WL 6995067, *17 (W.D.N.Y. 2016) (record must establish that defendant had permission from registered owner to use car) (collecting cases); *United States v. Santiago*, 174 F. Supp. 2d 16, 29 (S.D.N.Y. 2001) ("[a]mong the factual assertions [defendant] could have

included to have made a more persuasive case [to assert standing] are: how he came to be in lawful possession of the vehicle; who the car's rightful owner is; for what purpose he was authorized to use the car; where he was authorized to use the car; and for what period of time he was authorized to use the car[;] . . . [t]he failure to explain in any manner whatsoever the nature of [defendant's] lawful possession of the car fails to establish that he is entitled to a suppression hearing and is fatal to this suppression claim").  On this record, I find that Holley has not met his burden of establishing standing to contest the search of the Buick.

Nor does the fruit of the poisonous tree doctrine, which Holley invokes, provide an alternative basis for suppression.  "If the initial stop of the vehicle was illegal – that is, not supported by probable cause or reasonable suspicion of unlawful conduct – evidence seized in a subsequent search may well be excludable as fruit of the poisonous tree."  *See United States v. Shefler*, 2009 WL 102819, *3 (N.D.N.Y. 2009) (internal quotations omitted).  Here, however, Holley's Fourth Amendment rights were not violated by the traffic stop, and thus he may not resort to that derivative evidence doctrine.

For the reasons discussed above, I recommend that Holley's motion to suppress tangible evidence be denied.


**III.**    **Statements**

Finally, Holley moves to suppress the statements he made after his arrest on July 2, 2021.  (Docket ## 28 at ¶¶ 20-23; 40 at 7-9).  First, Holley maintains that the statements were the product of the unlawful stop of his vehicle.  (Docket # 40 at 8).  Because the stop of the vehicle did not violate Holley's Fourth Amendment rights, however, suppression on this basis is not justified.

Holley also contends that any statements he made were obtained in violation of his *Miranda* rights.[9] (*Id.*).  Statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that right.  *Miranda v. Arizona*, 384 U.S. at 444.  As the Second Circuit has stated:

> [I]nterrogation consists of express questioning or its functional equivalent. . . . [T]he overarching "custody" question is whether a reasonable person in the suspect's position would have understood [himself] to be subjected to restraints comparable to those associated with a formal arrest.

*United States v. FNU LNU*, 653 F.3d 144, 148, 153 (2d Cir. 2011) (internal quotations and brackets omitted).  The government does not dispute that Holley was in custody and had not been advised of his rights at the time he made the alleged statements.  (Docket # 41 at 10).

---

[9] Holley also challenges his statements on the grounds that they were involuntary.  (Docket # 28 at ¶ 21).  At oral argument on December 9, 2021, the Court advised defendant and his counsel that his affidavit in support of his motion to suppress statements was insufficient to raise a factual issue regarding the voluntariness of his statements and provided him an opportunity to supplement his affidavit.  *See United States v. Cobb*, 544 F. Supp. 3d 310, 339 (W.D.N.Y. 2021) ("[a] bald assertion that a statement was involuntary . . . could be based on any of a number of factual premises such as coercion, lack of *Miranda* warnings, or lack of competence[;] [w]ithout specification of the factual basis for such a characterization, the district court is not required to have a hearing") (quotation omitted); *United States v. Ortiz*, 1999 WL 1095592, *2 (S.D.N.Y. 1999) (denying motion to suppress post-arrest statement without a hearing where defendant did not present a disputed issue of fact as to whether his statement was knowingly and voluntarily made).  Holley has not provided a supplemental affidavit regarding the voluntariness of his statements.

In any event, the record demonstrates that his statements were voluntary.  Lathrop and Rusinko testified that they did not threaten or make promises to Holley in order to induce his statements.  Although Holley complained of a neck injury for which an ambulance was called, neither Lathrop nor Rusinko noticed any visible injuries, and Lathrop testified that Holley was able to walk on his own and appeared coherent.  Additionally, nothing in the video footage suggests that Holley's capacity was diminished or that he was suffering from injuries sufficient to render his statements involuntary.  (G. Ex. 4).

Rather, the salient dispute between the parties is whether Holley's statements were in response to interrogation by law enforcement officers.

Interrogation is not limited to "express questioning"; rather, it extends to the "functional equivalent" of questioning, namely, "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Broughton*, 600 F. App'x 780, 783 (2d Cir. 2015) (summary order) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980)). The Second Circuit has reaffirmed that the determination whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response should be made upon "the totality of the circumstances." *Id.* (quoting *Acosta v. Artuz*, 575 F.3d 177, 191 (2d Cir. 2009)).

Under the "pedigree exception" to the *Miranda* requirement, the "solicitation of information concerning a person's identity and background does not amount to custodial interrogation prohibited by *Miranda v. Arizona,* . . . whether that solicitation occurs before . . . or after . . . *Miranda* warnings are given." *United States v. Adegbite*, 846 F.2d 834, 838 (2d Cir. 1988) (citations omitted). The pedigree exception includes "routine booking question[s]" designed to elicit "biographical data necessary to complete booking or pretrial services." *Pennsylvania v. Muniz*, 496 U.S. 582, 601-602, 110 S. Ct. 2638, 110 L.Ed.2d 528 (1990). The pedigree exception does not include questions designed to elicit incriminating admissions. *Id.* at 602 n.14; *see also Rhode Island v. Innis*, 446 U.S. at 301. As the Second Circuit has acknowledged, "[r]outine questions about a suspect's identity . . . [are] ordinarily innocent of any investigative purpose [and] do not pose the dangers *Miranda* was designed to check; they are rather the sort of questions 'normally attendant to arrest and custody.'" *United States v. Gotchis*,

803 F.2d 74, 79 (2d Cir.1986) (quoting *Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L.Ed.2d 297 (1980)).

According to Holley, the record demonstrates that Lathrop asked him to provide his name and date of birth while he was in custody and without first advising him of his *Miranda* rights.[10] (Docket # 40 at 9). In Holley's view, Lathrop's questioning prompted the later statements he made to Lathrop. (*Id.*). Holley further argues that the statements he subsequently made to Rusinko were fruits of the unlawfully elicited statements he made to Lathrop. (*Id.* at 9). I disagree.

In this case, shortly after Holley was placed in Lathrop's patrol vehicle, Lathrop lawfully asked Holley his name and date of birth. *See*, *e.g.*, *United States v. Carmona*, 873 F.2d 569, 573 (2d Cir. 1989) ("[p]olice often know the names of suspects they intend to apprehend, . . . [but,] [a]s a cautionary measure, police usually prudently inquire as to the suspect's name to ensure that the wrong person is not apprehended"); *United States v. Adegbite*, 846 F.2d at 838 (pedigree exception allows solicitation of a defendant's nickname, which was used on arrest warrant, for identification purposes); *United States v. White*, 2007 WL 772387, *7 (W.D.N.Y. 2007) ("the only questions put to [d]efendant prior to advising of the *Miranda* warning were questions aimed at determining [d]efendant's identity[;] [i]t is well established that 'questions aimed at eliciting identifying or 'pedigree' information is permitted without [*Miranda*] warnings, even though the answers to such questions may become evidence either of the particular crime for which the suspect was arrested, or of some past or future crime not yet under investigation'") (quoting *Nicholas v. Goord*, 430 F.3d 652, 680 (2d Cir. 2005) (Lynch, J. concurring), *cert.*

---

[10] Holley also suggests that suppression is warranted because Lathrop could not confirm whether any of the officers at the scene asked Holley any questions prior to Lathrop's arrival. (Docket # 40 at 9). Nothing in the record, however, suggests that Holley was questioned, and Holley's affidavit does not assert that he was.

*denied*, 549 U.S. 953, 127 S. Ct. 384, 166 L.Ed.2d 270 (2006)); *United States v. Kadem*, 317

F. Supp. 2d 239, 241 (W.D.N.Y. 2004) (pedigree exception permits request that defendant

identify himself in order to ensure correct person is apprehended); *United States v. Tavares*, 2002

WL 31571662, *6 (S.D.N.Y. 2002) (questions as to the defendant's age, name, address and

identification fell within pedigree exception where the "questioning was of a limited nature,

designed to establish [defendant's] true age and identity").  After Holley provided that

information to Lathrop, conversation between them ceased.  The body camera footage

demonstrates that Holley and Lathrop were not speaking to each other for at least three minutes

when Holley, unprompted by Lathrop, made spontaneous statements unrelated to the issue of his

identification and date of birth.  Holley's unprompted statements do not transform Lathrop's

permissible inquiry into interrogation within the meaning of the Fifth Amendment.  *See*, *e.g.*,

*United States v. Castro*, 723 F.2d 1527, 1532 (11th Cir. 1984) (finding defendant's statement

"spontaneously volunteered" where it was made in response to police questions, but was wholly

unresponsive to question posed by officer); *United States v. Thomas*, 961 F. Supp. 43, 45-46

(W.D.N.Y. 1997) (defendant's second statement was unsolicited, spontaneous and voluntary

where initial statement was made in response to police question and subsequent statement was

non-responsive to officer's question; "single inquiry about the genesis of the altercation was,

under all the circumstances, not calculated to induce an admission as to [defendant's] intent");

*see also Rosa v. McCray*, 396 F.3d 210, 222 (2d Cir.) (defendant's statement concerning when

he had dyed his hair was offered "voluntarily and outside the scope of the question" about

defendant's natural hair color), *cert. denied*, 546 U.S. 889, 126 S. Ct. 215, 163 L.Ed.2d 201

(2005); *United States v. Tavares*, 2002 WL 31571662 at *6 ("[s]imply because a defendant gives

26

false information in response to pedigree questions, and therefore renders the information incriminating, does not mean that *Miranda* warnings were required").

Because Lathrop did not impermissibly interrogate Holley, Holley's subsequent statements to Rusinko cannot be seen as the product of a Fifth Amendment *Miranda* violation. Moreover, the record demonstrates that Holley's statements to Rusinko were also entirely unprompted. Holley initiated the conversation with Rusinko by calling him over to the patrol car; Rusinko did not ask any questions of Holley to induce his statements. On this record, I recommend that the district court deny Holley's motion to suppress statements.

## CONCLUSION

For for the reasons stated above, I recommend that the district court deny Holley's motion to suppress identification evidence as moot and deny Holley's motions to suppress tangible evidence and statements. **(Docket ## 28, 40)**. As noted above, *see supra* note 1, the government's motion for a protective order **(Docket # 32)** and *ex parte* motions for *Giglio* determinations **(Docket ## 33, 34, 35)** are granted solely for the purposes of the suppression hearing. The Court makes no determination as to whether the information at issue in those motions should be produced in connection with trial or other subsequent proceedings.


                                                        *s/Marian W. Payson*
                                                    _____
                                                    MARIAN W. PAYSON
                                                    United States Magistrate Judge

Dated: Rochester, New York
          April 26, 2022

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

    **ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

    **ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[11]

    The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

    **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

    The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

    Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**


                                *s/Marian W. Payson*
                                MARIAN W. PAYSON
                         United States Magistrate Judge


Dated: Rochester, New York
       April 26, 2022

---

[11]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).